**STX, INC., a California corporation, Plaintiff,**

**v.**

**TRIK STIK, INC., a Florida corporation, Defendant.**

**No. C 88–1765 FMS.**

United States District Court, N.D. California.

Oct. 12, 1988.

---

Dean D. Pregerson, Bergman & Wedner, Inc., Los Angeles, Cal., for plaintiff.

Maurice B. Pilosof, Beehler, Pavitt, Siegemund, Jagger, Martella & Dawes, Los Angeles, Cal., for defendant.

ORDER

PECKHAM, Chief Judge.

## I. INTRODUCTION

Three motions are formally before this court. First, defendant moves to transfer the venue of this action to the Southern District of Florida. The remaining two concern the substantive merits of plaintiff's claims: plaintiff's motion for a preliminary injunction and defendant's motion for dismissal due to failure to state a claim.[1]

## II. BACKGROUND

This action concerns kneepads used by skateboarders.[2] The plaintiff contends that defendant appropriated the appearance of its product. It seeks injunctive relief and damages for defendant's alleged violation of § 43(a) of the Lanham Act, unfair competition, and trademark dilution.

### A. *The Parties*

The plaintiff, STX, Inc. ("STX"), is a California corporation with its principle place of business in Santa Rosa, California. For the past nine years, it has manufactured the leading skateboard kneepad, the "Protector." The "Protector" has been promoted and sold under the trademark Rector, the most prominent line of skateboard products. A separate entity not party to this action has granted plaintiff exclusive license to use the trademark Rector on STX's kneepads.

The defendant, Trix Stik, Inc. ("Trik Stik"), is a Florida corporation with its principle place of business in Pampano Beach, Florida. The president of Trik Stik, Mr. Norman Levine, formed the corporation to market a stick-like sports device whose patent is still pending. Declaration of Norman Levine, paragraph 3, dated August 23, 1988. Prior to the formation of Trik Stik, Mr. Levine had distributed the "Protector" kneepad for another Florida-based business. Declaration of Pat McGirr, paragraph 8. The defendant began producing its own skateboard kneepad, "Dr. Bone-Saver," sometime in early 1988.

Plaintiff now seeks to join as a defendant a third party, NDL Products, Inc. ("NDL"). NDL is the parent corporation and sole stockholder of defendant, Trik Stik. Both are represented by the same attorney, Mr. Eugene Malin. Apparently, NDL now manufactures and sells the "Dr. Bone-Saver" kneepad. *See*, Second Declaration of Norman Levine, paragraph 4. Mr. Levine currently asserts that defendant Trik Stik transferred the marketing and sale of "Dr. Bone-Savers" to NDL on or before April 1, 1988. Second Levine Declaration, paragraph 7. In a signed declaration dated

---

1. Plaintiff has also requested in memorandum that the court enjoin a subsequently filed action and order Rule 11 sanctions against defendant. In the absence of a motion and briefing, we shall not enjoin the later action but recommend that counsel inform the Southern District of Florida of this order. For similar reasons, we will consider Rule 11 sanctions after a formal motion has been filed.

2. Both parties at times imply that elbowpads are also involved in this action. Plaintiff asserts, for example, that defendant's elbow pads also infringe upon its products. Plaintiff's complaint refers solely to kneepads, however. Thus, kneepads are the sole subject of this action.

June 21, 1988, however, Mr. Levine stated: "Trik Stik, Inc. does its business by selling knee and elbow pads to its dealers by telephone." First Levine affidavit, paragraph 4. Defendant has not provided any reason for the original mistake. In addition, Plaintiff challenges defendant's claim that it no longer sells "Dr. Bone–Savers." Plaintiff's vice-president and general manager states that he witnessed a Trik Stik booth displaying "Dr. Bone–Savers" for sale at a major sports trade show on September 10, 1988— four months after defendant contends sales ceased. Supplementary Declaration of Amnon Rodan, paragraph 5.

### B. *The Claim*

In this action, plaintiff seeks trademark protection for the "unique appearance" of the "Protector" kneepad. The "Protector's" product configuration is not the subject of a patent or trademark registration. Plaintiff asserts, however, that defendant has deceitfully replicated the shape, style, and appearance of its kneepad and thus violated § 43(a) of the Lanham Act.

This appearance consists of the particular combination of eight individual features:

> (1) the white knee cap on the pad, (2) six brass rivets attaching the cap to the cloth kneepad, (3) bright red fabric, (4) stitching pattern, (5) two blue elastic belts, (6) yellow strap connector connecting the elastic belt to the fabric at the front of the pad, (7) trademark area on top of pad, and (8) rear elastic backing with three-eighths inch horizontal line pattern.[3]

Defendant's Motion to Dismiss, page 2. Defendant's product, "Dr. Bone–Saver," contains all eight features. In contrast, at least seven other skateboard kneepads submitted to this court do not contain this particular combination of features. The parties agree that defendant has placed the label "Dr. Bone–Savers" in a prominent place on its product.

The "Protector" is the leading skateboard kneepad, generating over $1,000,000 in annual sales. Plaintiff began marketing the "Protector" nine years ago and considers it the "flagship" of its business. As part of the well-known RECTOR line of products, the "Protector" knee-pads are distributed through a national network of wholesale distributors. Skateboard magazines have used hundreds of photographs of the Protector kneepad, both in paid advertisements and in feature articles. Rodan Declaration, paragraphs 15. Clothing manufacturers have used RECTOR kneepads in advertisements to further their product's attractiveness to consumers. Rodan Declaration, paragraph 16.

The defendant introduced "Dr. Bone–Savers" early in 1988 and the product has generated approximately $60,000 in sales. Plaintiff has identified twenty-one stores in California that carry defendant's product. One distributor of the "Protector" cancelled his sales contract with plaintiff when it began carrying "Dr. Bone–Savers." The "Protector" sells for $35.95; "Dr. Bone–Saver" sells for approximately half that amount.

To support its contention that the "Protector" is nationally recognized, plaintiff has submitted an extensive market study (the "Ford" study) of consumer associations with skateboard kneepads. Following the interviews with 712 teenage skateboarders, the plaintiff's study concludes that 65% of the youngsters interviewed associated the plaintiff's kneepad with its

---

**3.** As detailed in plaintiff's complaint, this appearance is as follows:

> The Protector pads are characterized by a unique appearance that includes a distinctively designed white cap that is attached with six brass rivets on the sides of the cap, to a bright red Cordura, or similar material fabric, with a unique stitching pattern. Each pad is attached to the skateboarder with the use of two blue elastic belts which adjust with a hook and loop (Velcro) material. The upper blue

> elastic strap is attached to the front of the pad with a bright yellow hook and loop (Velcro) strap that extends across the front of the pad in a unique and distinctive manner. Each white cap has a distinctive area in the upper portion of the cap, where the trademark is placed. The rear of the pads contain a stretchable, almost transparent, elastic backing, which has a pattern of horizontal lines, approximately three-eights of an inch apart. Plaintiff's Complaint, Paragraph 5.

trademark name on the basis of appearance alone. The survey further concludes that 37% of the interviewees shown the defendant's product in its original packaging believed it was manufactured by plaintiff.

## C. *The Proceedings*

On May 12, 1988, plaintiff STX filed its complaint against the defendant Trik Stik in the Northern District of California (the "California action"). On June 28, 1988, the defendant filed two motions: (1) for summary judgment or, in the alternative, for dismissal for failure to state a claim, and (2) for transfer of venue to the Southern District of Florida. In a telephone conference on July 15, 1988, the parties and the court agreed to continue defendant's motions. Plaintiff states that it learned for the first time that NDL was the parent corporation of the defendant in preparation for this conference. At the telephone conference, the plaintiff notified Mr. Eugene Malin, counsel for both NDL and Trik Stik, that plaintiff would seek to join NDL as a defendant in the action. Mr. Malin refused to stipulate that plaintiff could amend the complaint to join NDL.

One day prior to the telephone conference (July 14, 1988), NDL had filed an action in the Southern District of Florida against the plaintiff. Counsel for NDL, Mr. Malin, did not inform the court or opposing counsel that he had filed this action during the telephone conference the following day. In the Florida action, NDL seeks a declaratory judgment to enjoin STX, the California plaintiff, from "claiming that [NDL] infringes [upon STX's] alleged trademark." Florida Complaint at 3. NDL has since moved for summary judgment in the Florida action based on the same claims the defendant has made in the instant proceeding. Plaintiff has moved to dismiss the Florida action based on the doctrine of comity. The Florida court has neither ruled nor scheduled a hearing on these motions.

On August 15, the plaintiff moved to enjoin the defendant from further sales of its kneepad. We scheduled this motion to be heard at the same time of defendant's motion to dismiss. The defendant then sought to supplement its declarations in support of its motion for summary judgment. We denied this request on August 22. On August 25, defendant then withdrew its motion for summary judgment. Defendant specified that it did not withdraw the motion to transfer venue or the motion to dismiss for failure to state a claim.

In the memorandum attached to this motion, defendant Trik Stik stated for the first time that it had ceased by April 1, 1988 all sales of "Dr. Bone–Savers." Defendant did not mention in this memorandum that NDL was now producing the kneepad. Defendant identified NDL as the current manufacturer of "Dr. Bone–Saver" for the first time in the Second Declaration of Mr. Levine accompanying defendant's response to the request for preliminary injunction filed August 30. Defendant contended in this response that a preliminary injunction should not be granted since "the [d]efendant permanently ceased selling the forms of alleged product design trademark almost forty-four days prior to this suit being filed."

On September 1, 1988, plaintiff filed a motion for leave to amend the complaint to allow joinder of NDL as a defendant. This motion shall be heard on October 17, 1988.

## III. DISCUSSION

### A. *Transfer of Venue*

28 U.S.C. § 1404(a) provides:

For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

Since defendant is a Florida corporation, this action could have been brought in Florida. We therefore have the authority to transfer the proceeding if we find that it furthers the convenience of the parties and witnesses and the interests of justice.

In seeking to transfer a case to a different district, a defendant bears a heavy burden of proof to justify the necessity of the transfer. The plaintiff's choice

of forum should not be easily overturned. *Shutte v. Armco Steel Corporation*, 431 F.2d 22, 25 (3rd Cir.1970); *Gallery House, Inc. v. Yi*, 587 F.Supp. 1036 (N.D.Ill.1984). As the Ninth Circuit has stated, "the defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir.1986). If the gain to convenience to one party is offset by the added inconvenience to the other, the courts have denied transfer of the action. *See, e.g., Gallery House*, 587 F.Supp. at 1040. The defendant offers three reasons for transferring the action to Florida: the added convenience to its witnesses, the allegedly less congested docket in the Southern District of Florida, and the easier access to proof. We shall address each in turn.

■ Defendant first argues that transfer will further the convenience of the witnesses. To support this contention, defendant notes that its six witnesses all live in the Southern District of Florida. The defendant suggests that "the likelihood of Florida witnesses ... appearing in a California court is extremely small." Defendant's Memorandum of Law on Motion to Strike or in the Alternative Motion to Transfer Venue at 12. As support for the motion, this contention is insufficient. First, plaintiff's witnesses would be equally inconvenienced by transfer. Plaintiff notes, for example, that the seven witnesses it has identified at this time all reside in California. Plaintiff's Opposition to Motion to Transfer Venue at 8. Moreover, defendant's claim that defense witnesses could not be expected to appear at trial must be discounted since at least four of the six witnesses are defendant's employees whom defendant can compel to testify. *See, Galonis v. National Broadcasting Co.*, 498 F.Supp. 789, 793 (D.N.H.1980) (discount inconvenience to party's witnesses when they are employees who can be compelled to testify).

■ Defendant next asserts that transfer to the apparently less congested courts in the Southern District in Florida would further the interest of justice. Defendant offers no evidence that the dockets in Florida are less congested. Given that the Southern District of Florida has not scheduled or heard any motions in the case filed by NDL, defendant's assertion appears meritless. Moreover, the case authority is mixed regarding whether docket congestion is even a valid consideration. *See, Fannin v. Jones*, 229 F.2d 368, 369–70 (6th Cir.), *cert. denied* 351 U.S. 938, 76 S.Ct. 834, 100 L.Ed. 1465 (1956).

■ Finally, defendant contends that the presence of its records in Florida justifies transfer. In the absence of any other ground to justify transfer, the location of Defendant's records in Florida falls woefully short of the grounds necessary to justify superseding the plaintiff's choice of forum. In the case at hand, moreover, transfer would impede access to plaintiff's records which will also be relevant.

Since the defendant can demonstrate no strong reasons for transfer, the plaintiff's choice of forum will be honored. The defendant's motion to transfer venue is denied.

B. *Preliminary Injunction*

■ Prior to discussing the merits of plaintiff's motion, we must address defendant's contention that the request is moot since defendant allegedly ceased sales of "Dr. Bone–Saver" prior to the filing of the complaint. We reject this claim for several reasons.

First, we question defendant's assertion. In a signed declaration, the plaintiff's vice-president and general manager stated that he witnessed a Trik Stik booth displaying "Dr. Bone–Savers" for sale at a major sports trade show on September 10, 1988—four months after defendant allegedly halted all sales. Defendant failed to provide any indication that such information was inaccurate either in writing or at hearing. Moreover, defendant originally represented that it did continue to manufacture and distribute "Dr. Bone–Savers", changing its story only recently in these proceedings. Since defendant's declarations have not

proven reliable, we have significant reason to doubt defendant's representations.

Second, even if NDL rather than the defendant currently sells "Dr. Bone–Savers," plaintiff should still be allowed to proceed with its motion. Plaintiff has failed to join NDL solely due to the machinations of the defendant and NDL. If we were not to allow plaintiff to proceed, we would reward the defendant and NDL for failing to represent accurately information concerning the manufacture of their kneepad. Consequently, we shall review plaintiff's motion for a preliminary injunction.[4]

The Ninth Circuit in *Model Rectifier Corp. v. Takachiho Int'l, Inc.*, 709 F.2d 1517, 221 USPQ 502 (9th Cir.1983) stated the standard for preliminary injunctions in trade mark actions:

> The party who seeks a preliminary injunction to stop a trademark infringement must show either: (1) probable success on the merits and irreparable harm, or (2) that serious questions are raised and the balance of hardships tip sharply in favor of the party requesting relief. *Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1134 (9th Cir.1979).

The court has further made clear that these "are not two distinct tests, but rather the opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987). Thus, we review the probability of success on the merits and the balance of hardships.

### 1. *Probability of Success on the Merits*

To establish probable success on the merits in an action for trade dress infringement, the plaintiff must demonstrate the trade dress of its product is protectable. "Trade dress" refers to the appearance of the product and may include features such as size, shape, color, color combinations, texture, or graphics. *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir.1987). The plaintiff must establish that the appearance of its product: (1) is non-functional, (2) has acquired secondary meaning, and (3) is likely to be confused with the "Dr. Bone–Saver" kneepad manufactured by defendant. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir.1987).

### a. *Functionality*

The central contention between the parties concerns whether the particular combination of features allegedly copied by defendant constitutes a functional trade dress. Plaintiff bears the burden of proof to establish non-functionality. *Rachel*, 831 F.2d at 1506.[5]

This circuit has adopted the "utilitarian" rather than the "aesthetic" functionality test. *First Brands*, 809 F.2d at 1382, n. 3. As the Ninth Circuit recently stated, "[a] product feature is functional if it is essential to the [product's] use ... or if it affects the cost or quality of the article [citation omitted]." *Id.* at 1381. The standard looks toward the function of the design feature: it will be considered functional if it improves performance, provides economy of manufacture, or in some other manner "furthers the usefulness of the product ... it adorns." *Viutton Et Fils, S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir.1981). *See also, Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417 (5th Cir. 1984). The courts have applied this standard to strike the appropriate balance between protection of an individual's investment and the furtherance of free competition. The appropriate inquiry is, therefore, whether protection of the particular appearance "will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *In re*

---

4. For the purposes of this memorandum, we will continue to refer to the defendant's continued manufacture of "Dr. Bone–Savers." Although it appears that defendant does continue to sell the product, we cannot reach this conclusion without further evidence and thus use the term for the sake of convenience.

5. The defendant suggests that it may seek Rule 11 sanctions for plaintiff's mistaken statement, later corrected, that it did not have the burden of proof. Such a threat is inappropriate. It is defendant's behavior that is questionable in this action.

*Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1342 (CCPA Cir.1982).

■ As a preliminary matter, we emphasize that the trade dress at issue is neither the "Protector" kneepad as a whole nor individual design features. As a matter of law, a product's trade dress must be analyzed as a whole. *First Brands,* 809 F.2d at 1381. Plaintiff in its complaint states the combination of individual characteristics that constitute the trade dress at issue:

> The Protector pads are characterized by a unique appearance that includes a distinctively designed white cap that is attached with six brass rivets on the sides of the cap, to a bright red Cordura, or similar material fabric, with a unique stitching pattern. Each pad is attached to the skateboarder with the use of two blue elastic belts which adjust with a hook and loop (Velcro) material. The upper blue elastic strap is attached to the front of the pad with a bright yellow hook and loop (Velcro) strap that extends across the front of the pad in a unique and distinctive manner.

Plaintiff's Complaint, Paragraph 5. At the outset, therefore, we dismiss defendant's assertion that "plaintiff must show each and every feature is a non-functional feature" in order to meet its burden.

■ Plaintiff makes two showings to support its claim of non-functionality of the combination of individual features detailed above. First, plaintiff notes the presence of multiple other kneepads that serve the same function at the same or lower price without the "Protector's" trade dress. Plaintiff has submitted to the court at least seven other kneepads that do not have this particular combination of features. Second, plaintiff notes that defendant's "Bone–Saver" does have the particular configuration of the "Protector." As visual inspection makes clear, both have the eight particular features identified in plaintiff's complaint. These include, for example, the

blue and yellow Velcro straps at top and bottom, red material on the front with blue backing, and six brass rivets to connect a white circular protective face to the pad.[6]

In the instant case, it is clear that the "Protector" trade dress described above does not serve a utilitarian purpose. The presence of multiple other kneepads without the exact combination of features illustrates that the trade dress is neither a commercial necessity nor "essential to the product's use." Alternative configurations can and do provide an equivalent function. Further, the price range of the alternative kneepads illustrates that the "Protector's" trade dress is not necessary to promote economy of manufacture or some other purpose that provides the plaintiff with a functional competitive advantage.

■ Plaintiff acknowledges that each feature independently furthers the kneepads function. This fact is not relevant to the appropriate analysis, however. *See, Dallas Cowboys, Etc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 203–04 (2nd Cir.1979) ("the fact that an item serves or performs a function does not mean that it may not at the same time be capable of indicating sponsorship or origin, particularly where the decorative aspects are non-functional"). Clearly, no kneepad could exist without some means to connect it to the leg such as the Velcro straps or a strong protective fabric such as the plastic cap. The trademark is claimed not for these individual elements but for the particular combination of features. This configuration serves to distinguish the "Protector" from rival kneepads rather than to protect the skateboarder's knees. Thus, we can conclude that the particular configuration of the "Protector" is non-functional. A contrary finding would prevent any trademark from being established if it in any way furthered the product's function. This circuit has explicitly rejected such an interpretation of functionality. *Viutton,* 644 F.2d at 773

---

**6.** Defendant appears to acknowledge this in its motion to dismiss. In this motion, defendant argues that the features are functional and the claim should therefore be dismissed. Defendant then mistakenly analyzes each of the eight features independently to determine whether it is functional. Thus, defendant appears to concede that the two pads do not differ as to any of these features.

(rejecting "important ingredient in commercial success" test of functionality).

Defendant's twin arguments that the configuration is functional both miss the mark. Citing *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir.1952), defendant first contends that the combination of features are functional because they "satisfy a demand for the aesthetic as well as the utilitarian." *Id.* at 343. As the above discussion makes clear, defendant has misstated the appropriate standard. The Ninth Circuit has clearly rejected defendant's interpretation of the cited language. *First Brands*, 809 F.2d at 1382; *Viutton*, 644 F.2d at 773. Defendant also relies upon a line of cases holding specific colors to be functional. This argument is puzzling since plaintiff seeks trademark protection for the particular configuration of its kneepad rather than its specific color composition.

The court therefore concludes that plaintiff has met its burden of showing nonfunctionality.

### b. Secondary Meaning

A product's trade dress attains secondary meaning when the purchasing public associates the dress with a single producer or source rather than just the product itself. *First Brands*, 809 F.2d at 1383. The consumer's attitude toward the product provides the strongest evidence of such an association. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir.1985).

■ The plaintiff has provided such evidence through the Ford market survey. This survey concludes that 65% of those interviewed associated plaintiff's kneepad with its trademark name on the basis of appearance alone. Traditionally, percentages above 50% have constituted evidence of a significant association. MCCARTHY, TRADEMARK AND UNFAIR COMPETITION, § 32:54 (2d Ed.1984). Defendant asserts only that the study does not measure public association at the time defendant began marketing Dr. Bone–Savers. Given defendant's inconsistency with regard to the initiation of marketing its product, this contention seems disingenuous. With regard to its merits, defendant has not provided any evidence that suggests that this study does not validly reflect the associations eight months before it was conducted. Plaintiff's product had been on the market for nine years and had generated substantial market identity prior to the introduction of defendant's product. It is unrealistic to expect a plaintiff to generate market studies until a potential infringer is discovered.

For the purposes of the preliminary injunction, we conclude that plaintiff has sufficiently established that the configuration of the "Protector" has acheived secondary meaning.

### c. Likelihood of Confusion

■ The third necessary element is the likelihood of confusion. "Regardless of how much secondary meaning it possesses, a product's trade dress will not be protected from an imitator that is sufficiently different to avoid such confusion." *First Brands*, 809 F.2d at 1383. The test is whether there is a likelihood of confusion resulting from the total effect of the defendant's product and package on the eye and mind of an ordinary purchaser. *Id.*

Defendant contends that the display of its label on the product saves it from being confused with the "Protector." It cites a case involving two champaign companies in which the court concluded: "the labels of the two bottles were so dissimilar as to rule out any possibility of confusion" in the minds of the consuming public. *Freixenet, S.A. v. Admiral Wine & Liquor*, 731 F.2d 148, 151 (3rd Cir.1984). Even this citation, however, emphasizes that the relevant determination is the possibility of confusion in the mind of the consumer.

Plaintiff demonstrates such a likelihood of confusion again through the Ford market survey. That study found that 37% of the interviewees shown the defendant's product in its original packaging believed it was manufactured by plaintiff. Such a finding is to be expected. The consumer of the skateboard kneepad is likely to be

young and unsophisticated (at least when compared to champagne purchasers). The two products are virtually identical except for the label, and the label itself provides no indication that plaintiff is not the manufacturer. In this context, it is unrealistic to expect the name alone to differentiate the two goods. In the absence of any evidence to the contrary, plaintiff has fulfilled its burden of demonstrating the likelihood of confusion.

### 2. *Balance of Hardships*

■ The second prong of the test for preliminary injunction requires the court to evaluate whether the balance of hardship favors the movants or whether there is a possibility of irreparable injury. In light of our conclusion that the products are likely to be confused, we can infer that plaintiff will suffer irreparable injury.

> Where there is substantial probability of confusion because of defendant's use of the same or a confusingly similar trademark, irreparable injury ordinarily follows. Confusion may cause injury to business reputation and loss of sales, and there may be no meaningful, proveable monetary recovery available.... Damage to an intangible value such as reputation and goodwill can never be accurately ascertained. Such damage may well occur if the quality of the products sold under the infringing mark is inferior to those of the plaintiff.

GILSON, TRADEMARK PROTECTION AND PRACTICE § 8.07[1]. This inference is borne out by the instant situation.

■ The reputation plaintiff has developed for a quality product is threatened by the continued sale of "Dr. Bone–Savers." Throughout the nine years of production, plaintiff has manufactured the product in California at added expense to maintain quality control. Defendant manufactures its product overseas and sells it for half the price of the "Protector." Defendant has not challenged the clear implication that "Dr. Bone–Savers" are made of lesser quality material and with fewer controls. In light of the likelihood of confusion, plaintiff has made a sufficient showing that it risks its reputation of high quality products if defendant's kneepad continues to be sold.

Plaintiff has also suggested that it will suffer a loss of sales. Although we cannot determine that all of defendant's sales were due to the confusion over the products, plaintiff did lose at least $31,000 in sales when one distributor switched from plaintiff's to defendant's product. Plaintiff's Memorandum in Support of Preliminary Injunction at 31. Whatever the current loss of sales, defendant's continued sale of its product imposes greater hardship on plaintiff than defendant. The "Protector" is plaintiff's leading product, generating over $1,000,000 in annual sales. Defendant has only recently started selling the product and has not made an equivalent investment.

We therefore conclude that plaintiff has demonstrated that it suffers the balance of hardships and that the possibility of irreparable harm exists.

### 3. *Conclusion*

We conclude that plaintiff has demonstrated both a probability of success on the merits and the possibility of irreparable harm. The motion for preliminary injunction is granted. Defendant advances the same rationale in its motion to dismiss. Given our conclusion above, we find this motion meritless. Defendant's motion to dismiss is denied.

### IV. ORDER

We hereby enjoin defendant, during the pendancy of this action, from producing, manufacturing, distributing, marketing, selling, offering for sale, promoting, advertising, or otherwise exploiting in any manner, any kneepad of a design identical, or almost identical, to those of the plaintiff which, by imitation, color, or otherwise are likely to be mistaken for or confused with the "Protector" kneepad manufactured by plaintiff.

This order is binding upon the parties, its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who re-

ceive actual notice of this order by personal service or otherwise.

The defendant shall immediately give written notice of this order to all persons or entities engaged in active concert or participation with defendant in producing, manufacturing, distributing, marketing, selling, or offering for sale, promoting, or advertising the kneepad(s) manufactured by defendant.

Defendant's motion to transfer venue is denied for the reasons stated above.

IT IS SO ORDERED.