**INTERACTIVE NETWORK, INC., a California corporation, Plaintiff and Counterdefendant,**

v.

**NTN COMMUNICATIONS, INC., a Delaware corporation, Defendant and Counterclaimant.**

No. C–93–20432–RMW (PVT).

United States District Court, N.D. California.

Feb. 7, 1995.

Frank E. Scherkenbach, Fish & Richardson, Menlo Park, CA, for plaintiff and counterdefendant.

Lewis Anten, Law Offices of Lewis Anten, Encino, CA, Bruce D. Kuyper, Irell & Manella, Los Angeles, CA, for defendant and counterclaimant.

## ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WHYTE, District Judge.

Plaintiff and Counterdefendant Interactive Network, Inc.'s ("Interactive" or "IN") motion for summary judgment was heard on

January 20, 1995. The court has read the moving and responding papers and heard the oral argument of counsel. For the reasons set forth below, the court denies in part and grants in part Interactive's motion for summary judgment.

## I. BACKGROUND

In the early 1980s Defendant and Counterclaimant NTN Communications, Inc. ("NTN") developed "QB1," an interactive game played in conjunction with televised football games, which was first used in sports bars and restaurants. In 1990 Plaintiff and Counterdefendant Interactive began selling, under license from NTN, a version of QB1 to subscribers of its home interactive television system. In 1993 Interactive developed its own interactive football game called "IN The Huddle," which is to be used in homes on Interactive's system.

On June 11, 1993, Interactive filed a suit in this court seeking a declaration that IN The Huddle does not infringe NTN's intellectual property rights in QB1. Interactive filed a first amended complaint on August 4, 1993 which NTN answered on September 15, 1993. After Interactive first offered its subscribers IN The Huddle in place of QB1 on September 30, 1993, NTN filed a counterclaim against Interactive alleging copyright infringement and federal and state trademark, trade dress, and unfair competition claims.

On January 6, 1994, Interactive obtained a new, temporary sublicense to offer QB1 to its subscribers through March 31, 1995 and thereafter removed IN The Huddle from the market. Following this, NTN moved this court to dismiss Interactive's complaint as moot because Interactive allegedly agreed not to use IN The Huddle until April 1995, and not in conjunction with NFL broadcasts, for which NTN holds an exclusive license. On April 26, 1994, this court held that Interactive's claims were not moot as to its use of IN The Huddle with non-NFL games, such as college and Canadian Football League games. Interactive admits that it intends to again offer IN The Huddle starting sometime in 1995.

On June 9, 1994, Interactive filed its second amended complaint, which alleges that Interactive has a "real and reasonable apprehension that it will be sued by NTN for infringement of copyrights, trademarks, trade dress, and related rights" although it alleges that it does not and will not infringe on such rights. (Pl.'s Second Am. Compl., ¶¶ 11, 13.) NTN answered the second amended complaint on July 15, 1994, while amending its own counterclaim. The amended counterclaim alleges that Interactive's past use and present threatened use of IN The Huddle constitute (1) false designation of origin, false descriptions and representations, and unfair competition, pursuant to 15 U.S.C. section 1125(a), (2) trade dress infringement causing confusion among the public, pursuant to 15 U.S.C. section 1125(a), (3) unfair and fraudulent business practices, unfair competition, and trademark and service mark infringement, pursuant to the common law and California Business and Professions Code sections 17200 et seq. and 17500 et seq., (4) intentional interference with prospective economic advantage, and (5) copying and incorporating substantial and distinctive elements of QB1 in violation of copyright and trade dress rights. Interactive replied to the amended counterclaim on August 1, 1994.

On December 9, 1994, Interactive brought the present motion for summary judgment of noninfringement.

## II. LEGAL STANDARDS

The purpose of summary judgment is to avoid a trial when there is no genuine factual issue and the moving party is entitled to judgment as a matter of law. *Bloom v. General Truck Drivers, Office, Food & Warehouse Union,* 783 F.2d 1356, 1358 (9th Cir. 1986). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is a "genuine" issue of material fact only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Entry of summary judgment is mandated against a party if, after adequate time for discovery and upon motion, the party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court, however, must draw all justifiable inferences in favor of the nonmoving parties, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 2434–35, 115 L.Ed.2d 447 (1991). The court will consider the motion now before it with these standards in mind.

## III. ANALYSIS

Interactive argues that it is entitled to summary judgment on its declaratory action and on NTN's counterclaims because the intellectual property laws do not protect the ideas and functional elements underlying QB1. Specifically, Interactive argues that (1) copyright law does not protect the QB1 game format because game ideas and rules are functional concepts to be left in the public domain, (2) the Lanham Act's trade dress and unfair competition protection do not cover QB1's game format and rules because these features are functional, (3) California unfair competition law cannot be used to protect features not protected by federal copyright or patent law, and (4) intentional interference with prospective economic advantage does not apply because Interactive's conduct of copying unprotectible features constitutes bona fide competition.

NTN responds that genuine issues of material fact exist to preclude summary judgment. Specifically, NTN alleges that factual issues exist as to whether (1) QB1 contains nonfunctional elements which are copyrightable expression, (2) IN The Huddle copies nonfunctional elements of QB1's trade dress leading to a likelihood of consumer confusion, and (3) Interactive violates unpreempted state unfair competition laws.[1]

## A. Copyright Infringement

■ The claimed protection of QB1 fits best under the Copyright Act's protection of "audiovisual works," 17 U.S.C. § 102(a)(6), which has been held to cover the display of images from video games. *See generally* Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.18[H][2][b] (1994). However, section 102(b) provides in part that "[i]n no case does copyright protection for an original work of authorship extend to any idea … regardless of the form in which it is described, explained, illustrated, or embodied in such work." Instead, copyright law protects only an author's expression of an idea. *Mazer v. Stein*, 347 U.S. 201, 217–18, 74 S.Ct. 460, 470–71, 98 L.Ed. 630 (1954).

■ In the absence of evidence of literal copying, a party can prove non-literal infringement by showing access to the copyrighted work along with "substantial similari-

---

1. NTN makes two additional arguments for denying the motion for summary judgment.

 First, NTN points to Interactive's failure to comply with Local Rule 220-7, which states in pertinent part that "[m]otions for summary judgment shall be supported by a statement of the material facts not in dispute." NTN also cites a recent unpublished opinion, *DH Technology, Inc. v. Synergystex International, Inc.*, 1994 WL 163917 (N.D.Cal. April 14, 1994) for the proposition that Interactive's motion "should be denied on [the basis of Interactive's failure to file a separate statement of undisputed material facts] alone." (Def.'s Opp'n Br. at 22.) *DH Technology* does not support such a harsh result. In *DH Technology*, the court criticized both plaintiff and defendant for failing to file statements of undisputed facts with their cross-motions for summary judgment and for submitting confusing briefs.

 Together, these failures precluded the court from stating what facts remained without substantial controversy under Fed.R.Civ.P. 56(d). *Id.* at *3. The motion for summary judgment was denied, however, because the court found that there were genuine issues of material fact, not because of the procedural deficiencies. *Id.* at *2. Furthermore, recognizing its oversight, Interactive has since filed a list of undisputed facts.

 Second, NTN argues that the summary judgment motion should be denied because delays in discovery and the failure to turn over relevant documents preclude NTN's ability to oppose this motion. Because of this court's decision on trade dress nonfunctionality and the resulting irrelevance of the issue of likelihood of confusion—to which the disputed documents relate—the court need not address this argument. *See infra* part III.B.

ty." *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir.1988). Under the Ninth Circuit's two-step analysis of substantial similarity, the party claiming infringement must meet an "extrinsic" test to determine whether the ideas found in the two works are substantially similar and an "intrinsic" test to compare forms of expression. *Id.* at 208 (citing *Sid & Marty Krofft Television Products, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977)). Certain similarities are excluded from the comparison. Under the "merger doctrine," when an idea and a particular expression of that idea are so inseparable that protecting the expression would necessarily confer a monopoly on the idea because only a limited number of ways exist to express the idea, the court will not find substantial similarity absent virtually identical copying. *Id.* (citing *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir.1971) (finding merger of idea and expression in jeweled bee pin)). Another concept, the "scenes a faire" doctrine, denies copyright protection to elements of expression that are "as a practical matter, indispensable or at least standard in the treatment of a given [idea]." *Id.* (quoting *Atari, Inc. v. North American Phillips Consumer Electronics Corp.*, 672 F.2d 607, 616 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982)). In the recent Ninth Circuit decision in *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir.), *pet. for cert. filed*, 63 U.S.L.W. 3518 (1994), the court limited copyright protection by holding that copyright does not protect the purely utilitarian or functional aspects of Apple's graphical user interface because those aspects are constrained by such limitations as the hardware, ergonomics, and issues of "user friendliness." *Id.* at 1444.

Generally, summary judgment is not favored on the issue of substantial similarity in copyright cases. *Frybarger v. International Business Machines Corp.*, 812 F.2d 525, 528 (9th Cir.1987). Nevertheless, summary judgment is appropriate on the issue of substantial similarity if no reasonable jury could find that the works are substantially similar in protectible expression. *Id.*; *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir.1991). Because the burden of proof in an infringement case is on the party claiming infringement (NTN), summary judgment of noninfringement for the alleged infringer (Interactive) must be granted unless NTN can demonstrate a genuine issue of material fact as to whether a reasonable jury could conclude that the two works are substantially similar in both ideas and expression. *Frybarger*, 812 F.2d at 528–29. Summary judgment is particularly appropriate where the idea and expression are inseparable or where analytic dissection determines that all similarities arise from standard elements derived from a common idea. *See Pasillas*, 927 F.2d at 443; *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987).

Interactive seeks a summary judgment of noninfringement on the ground that those elements of QB1 that IN The Huddle allegedly copies are unprotected ideas and functional features rather than copyrightable expression. NTN responds that IN The Huddle does more than just copy the *idea* or the necessary functional elements of an interactive football game. NTN asserts that Interactive copied the unique elements and distinctive arrangement constituting QB1's expression, such as: the three-level play prediction structure; the scoring system, including the "Game Breaker" feature, the "consecutive bonus" feature, and the 100/–10 point scoring system; the layout and arrangement of the graphical user interface; and various other nonfunctional features, such as the broadcast of an expert's score and statistical information and the use of a particular opening animation sequence. (Def.'s Statement of Disputed Facts, ¶¶ 1–5, 12.) NTN additionally contends that Interactive copied the format of NTN's real-time data feed, which is used to transfer coded information regarding play outcomes. (*Id.*, ¶ 13.) NTN disputes Interactive's contention that the copied elements are "inherent in, inseparable from, or constrained by the idea of an interactive football game." (Def.'s Opp'n Br. at 20.) Instead, NTN claims that QB1 represents but one possible way to design such a game, with a distinctive play prediction structure and an arbitrary scoring system. (*Id.*)

Interactive cites *Data East* for the proposition that even detailed functional similarities do not constitute copyright infringement. In *Data East,* the court found unprotectible many elements of a karate video game which it held "necessarily follow from the *idea* of a martial arts karate combat game, or are inseparable from, indispensable to, or even standard treatment of the *idea* of the karate sport." 862 F.2d at 209. Among the unprotectible elements common to both games were such features as "fourteen moves," "changing background scenes," "30–second countdown rounds," "a provision for 100 bonus points per remaining second," a referee who says " 'begin,' 'stop,' 'white,' 'red,' which is depicted by a cartoon-style speech balloon," and various karate moves. *Id.* To support its position, NTN cites *Sheehan v. MTV Networks,* 22 U.S.P.Q.2d 1394, 1396, 1992 WL 58876 (S.D.N.Y.1992), which finds protectible elements that, though individually are mostly stock, are selected, organized, and presented in an original fashion.

■ A preliminary question for the court is whether QB1 contains protectible expression. Although Interactive implies in its briefs that summary judgment is warranted because QB1's idea of an interactive football game is unprotectible, the court notes that even if the additional elements of QB1 are standard, QB1 is entitled to at least some copyright protection for its original combination of elements. *See Sheehan,* 22 U.S.P.Q.2d at 1396.

■ The remaining question in this case is whether IN The Huddle can be found, as a matter of law, not to infringe on QB1's protectible elements. Because ownership and access are not disputed by Interactive in this motion, the critical issue is substantial similarity. The court may decide this issue on summary judgment if no reasonable jury could find that, after excluding all unprotectible elements of QB1, the remaining elements are substantially similar to those in IN The Huddle.

Under the extrinsic test, the court finds that the idea of both games are substantially similar, namely that of a live, play-along, interactive game to test one's ability to make multi-staged predictions regarding plays in a football game where one is rewarded with points corresponding to the difficulty and accuracy of the prediction made.

The similarity of ideas between the two games requires the court to apply the intrinsic test. Here, the trier of fact must determine if the "total concept and feel" of the expressive elements of both works are substantially similar. However, where the court finds similarities only in those elements that are not protectible, summary judgment of noninfringement is appropriate. *Frybarger,* 812 F.2d at 530.

Initially, the court finds that several of the claimed similarities between QB1 and IN The Huddle involve elements covered under the *Herbert Rosenthal Jewelry* doctrine of idea/expression merger. Although NTN cites several alternatives to the three-level prediction scheme employed by both QB1 and IN The Huddle, the court finds that, given the concept of a predictive football game, there are only a limited number of ways of organizing play predictions. The range of possible predictions is somewhat limited by the nature of the sport of football. NTN cannot, therefore, use its particular three-tiered scheme to monopolize the idea of a predictive football game. Additionally, under the "scenes a faire" doctrine, the court must also ignore similarities in expression arising from features that are "as a practical matter indispensable, or at least standard, in the treatment of a given [idea]." *Id.* Certain aspects of the scoring in QB1 are common among video games, and perhaps are inherent in any interactive, predictive game. Video games, as well as other genres such as quiz shows, commonly award points for successful actions by the player and subtract points for mistaken actions. Likewise, it is inherent in the nature of a predictive game that more points be awarded for successful actions that are statistically less likely to occur.

Nevertheless, the court cannot say, as a matter of law, that the remaining similarities in the format and scoring systems of QB1 and IN The Huddle are not substantially similar. For example, the court is not convinced that the particular point values as-

signed to various correct and incorrect predictions are not somewhat arbitrary, such as QB1's 100/–10 point scheme for a correctly or incorrectly predicted pass, which IN The Huddle copies exactly. It does not appear that these numbers are necessitated by such unprotectible facts as the statistical likelihood of such plays. While probabilities derived from actual NFL statistical data could justify similarities in the relative scores awarded for various correct predictions, the evidence does not establish that those elements of QB1 that IN The Huddle copies are confined to such unprotectible elements. Such elements as the "consecutive bonus" and the "clutch pick" bonus do not necessarily derive from the idea of an interactive football game.

The claim of noninfringement in this case is not as compelling as in *Data East.* Certainly, IN The Huddle cannot be found to infringe on the basis of copying such elements as predictions of running and passing, to the left, middle, or right, and deep, short, or back, which are inherent in the sport of football. However, compared to the similarities between the competing karate video games in *Data East,* 862 F.2d at 209, which included various karate moves, the similarities between QB1 and IN The Huddle involve elements that are not as standard and not as fundamentally related to the nature of the underlying sport. Because the present case involves two games which a reasonable jury could find contain substantial similarities among protectible elements, the court finds that summary judgment of noninfringement is inappropriate on such protectible elements of QB1 as the scoring system, including the "consecutive" and "clutch pick" bonuses.

**Infringement of "Newly Claimed" Features**

NTN additionally alleges that Interactive has infringed various other nonfunctional features of QB1, such as the opening animation sequence, the screen displays, and the format of the real-time data feed. As to the claim of infringement of the data feed format, NTN argues that IN The Huddle needlessly copies the arbitrary ordering and structure of the data fields, which it contends are protected under *Engineering Dynamics, Inc. v. Struc-*

*tural Software, Inc.,* 26 F.3d 1335 (5th Cir. 1994) (finding computer input formats copyrightable).

Interactive argues that these claims are not pleaded and are made here for the first time. Alternatively, Interactive argues that NTN cannot sue based on the data feed document without first producing a copyright registration. Interactive further argues that it should win on the merits because there is no expert testimony that QB1's and IN The Huddle's data feed formats are substantially similar.

▮▮ The court finds that NTN's amended counterclaim's fifth claim for relief includes allegations of copyright infringement. (Def.'s Am. Countercl. at 13–14.) Although not mentioned specifically in the pleadings, allegations of infringement of QB1's data feed format are not new absent a showing by Interactive that NTN's copyright claims were limited to copying of the format and rules of QB1. Further, the court finds that QB1's data feed structure consists of protectible subject matter. *See Engineering Dynamics,* 26 F.3d at 1340–48.

▮▮ NTN directs the court to two portions of computer source code it alleges are substantially similar. (*Compare* Weiner Decl., Ex. W, at INC000079–80 *with* Weiner Decl., Ex. V, at INC000156–57.) The court, however, is unable to find any similarities in protectible expression in the short portions of the two programs claimed to be substantially similar. NTN has not offered any expert evidence regarding substantial similarities. Instead, NTN cites testimony by several Interactive employees regarding similarities. However, this testimony refers to similarities between NTN's data feed and Interactive's version of *QB1,* not IN The Huddle. Therefore, the court finds that, as a matter of law, there is no substantial similarity between the data feed structures of the two works. Accordingly, summary judgment of noninfringement is granted as to this element of QB1.

As to any claim that IN The Huddle infringes QB1's graphical user interface, screen displays, and opening animation, the court finds that, as a matter of law, Interactive has

not infringed NTN's copyright because Interactive, not NTN, is the author of these features. *See infra* part III.B.

## B. Lanham Act

▮ Although certain features are not protected by copyright, they may nonetheless be entitled to protection under the Lanham Act. Section 43(a) of the Lanham Act provides, in pertinent part, that

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, character, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). The Lanham Act has been held to protect the "trade dress," or the total image of a product, to the same extent as an unregistered trademark. *International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 822–23 (9th Cir.1993).

### Nonfunctionality

▮ Section 43(a) protection depends on nonfunctionality because, otherwise, the protection would grant a perpetual monopoly over features that could not be patented. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992); *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1531 (9th Cir. 1992). In the Ninth Circuit, the burden of proving nonfunctionality is on the party claiming trade dress infringement. *Id.* at

1530–31; *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 776 (9th Cir. 1981). However, whether trade dress is functional is a question of fact. *Id.* (reversing summary judgment on factual issue of trade dress functionality). Nevertheless, the party claiming trade dress infringement must make some showing of nonfunctional features or a nonfunctional arrangement in order to avoid summary judgment. *HWE, Inc. v. JB Research, Inc.,* 993 F.2d 694, 696 (9th Cir. 1993) (upholding summary judgment based upon failure to prove nonfunctionality). The Ninth Circuit test for functionality looks at a product's trade dress as a whole, considering

> (1) whether a particular design yields a utilitarian advantage; (2) whether alternative designs are available in order to avoid hindering competition; and (3) whether the design achieves economies in manufacture or use.

*International Jensen,* 4 F.3d at 823. Moreover, functional features are those that "constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Vuitton,* 644 F.2d at 774. Although some of a product's individual features may be functional, the combination of these features may, when analyzed as a whole, be nonfunctional if it serves to distinguish the product from rival products rather than being necessary to the product's use. *See STX, Inc. v. Trik Stik, Inc.,* 708 F.Supp. 1551, 1558–59 (N.D.Cal. 1988) (finding that eight elements copied from kneepad, including white cap, rivets, bright red cordura, stitching, bright yellow velcro, and two blue elastic belts, although independently functional, together served to identify origin and were nonfunctional because numerous other kneepads did not copy this grouping of features).

NTN lists several features of QB1 that it alleges are nonfunctional trade dress, and for which numerous practical alternatives exist such that protection of those elements would not hinder competition. First, NTN states that viable alternatives exist to the distinctive three-level prediction scheme of QB1, such as the prediction schemes described in the Lockton and Everton patents. Second,

NTN states that various aspects of the scoring of QB1 constitute distinctive trade dress elements that are not inherent in interactive football games and for which various alternative scoring methods exist.

Interactive responds that all of the above elements of QB1 are functional and not protectible as trade dress because they constitute the crux of the interactive football game and are essential to the way the game is played. Further, Interactive contends that there is no feasible alternative way to play an interactive football game, as evidenced by the fact that the only games ever to have come to market, QB1 and IN The Huddle, as well as the Everton and Lockton patents, all include these features. Interactive stresses that the proper test for functionality focuses on whether a feature is essential to or affects the cost or quality of the particular article which contains that feature.

Interactive claims that NTN focuses solely on one aspect of the functionality test, whether alternative designs are available, and ignores whether the feature yields a utilitarian advantage. The language in *Sega* regarding whether a feature "constitute[s] the actual benefit that the consumer wishes to purchase" supports Interactive's position. 977 F.2d at 1531 (quoting *Vuitton*, 644 F.2d at 774). Analyzing the various alleged trade dress elements with the foregoing legal standards in mind, the court finds that no reasonable jury could find that QB1's copied features are protectible as trade dress.

**Three–Level Prediction Scheme and Scoring**

■ First, the three-level prediction scheme and the scoring and bonus systems used cannot be said to be only partly functional—they are essential to how consumers enjoy the QB1 game; they are hardly "an assurance that a particular entity made, sponsored, or endorsed a product." *Id.* Further, they are clearly essential to QB1's "use or purpose or . . . affect[ ] the cost or quality of" QB1. *International Jensen*, 4 F.3d at 823; *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). Although there are possible alternatives to QB1's prediction and scoring

schemes, such as those claimed in the Everton and Lockton patents, this alone does not raise a genuine issue as to QB1's nonfunctionality. Where a feature is the best one, or one of a few superior designs, competition would be hindered by a monopoly on this scheme. *See In re Bose Corp.*, 772 F.2d 866, 872–73 (Fed.Cir.1985) (finding speaker enclosure shape functional although alternatives exist where shape is one of limited number of efficient designs). NTN is only able to mention two unpracticed patents as viable alternative schemes to the QB1 scheme, which is far less than the eight alternative kneepad designs on the market in *STX.* 708 F.Supp. at 1558.

Most trade dress cases involve such claimed features as shape, color, stitching, and materials, which in a given case usually both identify the product's source and serve some utilitarian or aesthetic purpose. This case is distinguishable in that the basic rules and prediction scheme used by QB1 are so intimately related to the purpose of the interactive football game that to label them as "nonfunctional" would render that term meaningless. Further evidence of the essential functionality of the main elements of QB1 is that two similar game designs have received utility patents. *See* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7.29 (3d ed. 1994) (stating that valid patent disclosing utilitarian advantages of particular design is very strong, if not conclusive, evidence of functionality).

**"Newly Claimed" Features**

■ In its opposition brief, NTN raises several features of QB1 that it alleges are nonfunctional trade dress copied by IN The Huddle: the combination and arrangement of QB1's graphical user interface and screen layout, the display of statistics, the opening animation sequence, the participation of an expert or celebrity, and the language of the promotional materials describing how to play QB1.

Interactive's first argument is that these purported trade dress features are raised here for the first time. The court agrees as to all but one of the claimed elements.

According to the amended counterclaim, NTN owns the "format, trade dress and rules of [QB1]." (Def.'s Am. Countercl., ¶ 4.) Further, NTN alleges that "IN The Huddle incorporates the inherently distinctive features of QB1, such as emphasizing the quarterback's play call, giving points for the correct prediction of the play, and generally has an overall scheme which is manifestly derived from and confusingly similar to the format and rules of QB1." (*Id.*, ¶ 12.) In response to interrogatories, NTN further specified the claimed "format, trade dress and rules":

> [T]he *format* of QB1 includes, but is not limited to, players predicting the nature of the offensive play in a football game prior to the snap of the ball, awarding points to players according to both the accuracy and specificity of the prediction, as well as the content of earlier predictions; and displaying the results of a prediction and score, all in accordance with the manner in which QB1 operates.
>
> . . . .
>
> [T]he *rules* of QB1 include, but are not limited to: *instructions to users as to how to play the game;* how predictions of offensive plays are made; how plays are called or described for the purposes of evaluating the accuracy of predictions; and how points and any bonus points are awarded and calculated for accurate or partially accurate predictions, or penalties for inaccurate predictions.
>
> . . . .
>
> [T]he *trade dress* of QB1 is the overall impression created by QB1, including but not limited to the protectable [sic] elements of QB1 ... that have been copied and/or otherwise misappropriated by Interactive.

(Def.'s Suppl. Resp. to Interrogs. Nos. 5–8 of Pl.'s First Set of Interrogs. at 5–7 (emphasis added).) The court finds that the pleadings and interrogatory answers are insufficient to assert NTN's claimed trade dress features of the screen layout, opening animation sequence, expert player feature, or color com-

mentary.[2] However, NTN has asserted a claim of trade dress infringement as to the instructions in the "How To Play" guide.

**Infringement By Interactive–Created Features**

 Interactive argues that NTN cannot claim trade dress rights in the instruction manual because it consists of Interactive's intellectual property, as Interactive is its author. This claim raises a difficult question of trade dress law for which this court found little relevant authority: whether a licensor can acquire trade dress rights in those features of a licensed product that are added by the licensee. On the one hand, like tangible property rights, intellectual property rights usually depend on ownership of the claimed property. For instance, in copyright law, the author of an original work automatically owns the copyright in the work. *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 346, 111 S.Ct. 1282, 1287–88, 113 L.Ed.2d 358 (1991). On the other hand, when an owner licenses its trade dress and maintains adequate control over the quality of goods sold by the licensee, the owner retains rights in the trade dress. *Taco Cabana International, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113 (5th Cir.1991), *aff'd,* 502 U.S. 1071, 112 S.Ct. 964, 117 L.Ed.2d 130 (1992). However, the court must examine the language of the particular licensing agreement. Under the licensing agreement at issue here, whereby NTN allowed Interactive to provide its customers with QB1, NTN required Interactive to protect its trademark with appropriate trademark notices and to acknowledge that NTN owns the QB1 trademark. (¶¶ 2(e), 4(a).) NTN required Interactive to bear the costs of adapting its rules to Interactive's system. (¶ 3(e).) However, the agreement explicitly does not address

> the claims by NTN that the format of the QB1 game, including its rules and manner of play, are inherently distinctive or have come to be exclusively identified with NTN or that the play of the game IN The Huddle by IN has violated NTN's rights;

---

**2.** Even were these elements properly raised by the pleadings and interrogatory answers, they would not be protectible as NTN's trade dress

because Interactive created them. *See* discussion *infra.*

nor has an agreement been reached regarding IN's claim that the Licensed Rights are not required to enable IN to provide interactive football games to its subscribers.

(¶ 4(a).) The agreement further states that "IN will have complete control of its own broadcast, and IN will insert its own commercials, trivia questions, interactive advertising, background commentary, expert player information, etc., which shall not interfere with or reflect negatively on the quality of QB1." (¶ 5(a).) This sentence implies that the agreement assumes that Interactive will add its own intellectual property to QB1 such that its game will be consistent with other Interactive games. In fact, Interactive received little assistance in implementing QB1 on its system, beyond learning the rules, scoring, and structure of the data feed of QB1. (Scherkenbach Supp. Decl., Terry Dep., at 68–69.) Because it cannot be said that Interactive "copied and/or otherwise misappropriated" *NTN's* trade dress features, because these features are Interactive's, the court will not include these features in its trade dress analysis. This result is supported by *Words & Data, Inc. v. GTE Communications Services, Inc.*, 765 F.Supp. 570, 580 (W.D.Mo.1991), in which the court found irrelevant to the functionality question two features of plaintiff's product that defendant had authored itself.

Furthermore, the evidence shows that several elements of Interactive's version of QB1 were taken from other Interactive games, and thus may contain elements of Interactive's trade dress. (Scherkenbach Supp. Decl., Lockton Dep., at 117, 127–28.) NTN protects its trade dress rights by ensuring that Interactive's contributions to the game do not harm the appearance of QB1. Therefore, NTN cannot claim that the instruction manual, or other elements authored by Interactive, are protected by NTN's trade dress. Although consumers may come to associate certain Interactive-created features with NTN's game, this was anticipated by the language of the agreement and is fair because these elements may pass on good will Interactive earned through its other games.

Additionally, Interactive's instruction manual is hardly nonfunctional. Users do not look upon the manual to identify the product's sponsorship, but to learn how to play QB1.

**Nonfunctional Arrangement**

■ At oral argument, NTN asserted that this motion for summary judgment on trade dress is an "all or nothing" proposition because the test for nonfunctionality looks to the "total impression" of the trade dress. While some cases hold that it is erroneous to look only at whether individual features are functional, the court finds that, as a matter of law, the arrangement and composition of the protectible elements of QB1's trade dress are functional. Unlike the cases cited by NTN, here there are no features of QB1's trade dress that were created by NTN that do not "constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Vuitton*, 644 F.2d at 774. The court finds that no reasonable jury could find that both individually, and together, QB1's trade dress features are not essential to the use or purpose of QB1 or do not affect the cost or quality of QB1 and are therefore nonfunctional. *See HWE*, 993 F.2d at 696 (finding that controller, inset members, and base of ACU–MASSAGE individually and together are essential to the use of the table).

Because the court finds that NTN cannot overcome summary judgment on an essential element of its Lanham Act claim on which it bears the burden of proof at trial, the court need not address the issue of likelihood of confusion.

**C. California Unfair Competition Laws**

■ Interactive argues that NTN's state unfair competition claims, like the federal claims, do not protect the functional elements of QB1. Alternatively, Interactive argues that the state law claims are preempted by federal copyright and trade dress law, which leaves QB1's functional trade dress, ideas, and uncopyrightable expression in the public domain. *See Summit Machine Tool Manufacturing Corp. v. Victor CNC Systems, Inc.*, 7 F.3d 1434, 1440 (9th Cir.1993); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489

U.S. 141, 156, 109 S.Ct. 971, 980, 103 L.Ed.2d 118 (1989).

To the extent that NTN's claims depend on those elements of QB1 that the court found are uncopyrightable expression or functional "trade dress," the court finds that the state law claims have no merit. However, NTN further contends that, beyond copying QB1's trade dress and expression, Interactive has acted to create consumer confusion through various misleading press releases, which is actionable under California law. *See* Cal.Bus. & Prof.Code §§ 14330 *et seq.*, 17200 *et seq.* Interactive objects to as new any unfair business practice claims not arising from the same facts as the copyright and trade dress claims. However, these claims are raised by NTN's pleadings. (*See* Def.'s Am. Countercl., ¶ 19.) As to those claims regarding trademark dilution and misleading advertising, the court denies summary judgment because genuine issues of material fact remain.

### D. Interference With Prospective Economic Advantage

Interactive argues that it cannot be liable under a theory of intentional interference with prospective advantage because NTN has not alleged any conduct by Interactive that falls beyond the privilege of bona fide competition. 5 B.E. Witkin, *Summary of California Law,* Torts § 652 (1988). NTN does not specifically respond to this argument in its opposition, aside from arguing that this argument hinges on Interactive's proving that "NTN has no non-functional, protectable trade dress or copyright interests in QB1." (Def.'s Opp'n Br. at 22.) Because the court finds that a genuine issue of material fact exists as to the copyright claim, which could negate Interactive's privilege of fair competition, summary judgment is inappropriate on this claim as well.

### IV. ORDER

Interactive's motion for summary judgment is granted in part and denied in part as set forth above.